Judge Douglas, who's a New Orleanian, and she will have her formal investiture tomorrow, but you're probably too late to get tickets. But it'll be very nice. We have only one case on our docket this morning, but notwithstanding that, we appreciate if you attempt to adhere to our time limits. The red light means you should stop talking unless you're answering a question from the bench. We have also, we're familiar with the briefs and record excerpts, but we may not have gotten into the full record before argument, so we appreciate record citations when those are appropriate. With that, we call case number 22-30435, United States v. Yablon. As a celebrity musician, defendant Kentrell Gaulden posts videos of his lifestyle to social media to promote his music to millions of fans. To that end, a videographer paid through a corporate entity filmed him and a dozen or so other men carrying guns on a public street. This so-called lifestyle footage was in no way private. It was filmed in public in view of both friends and concerned neighbors. It was stored on equipment belonging to someone else. And the possibility that Gaulden might edit some of that footage out before posting it for millions to see doesn't change its essential purpose or character. This was exactly the type of lifestyle footage Gaulden voluntarily sought to release to promote his public persona on the internet. I'd like to focus the court's attention this morning on two things that I think are key to this case. And the first is what I think Gaulden would have needed to show to demonstrate a reasonable expectation of privacy in this video and why neither the district court's factual findings nor the evidence that Gaulden presented was enough. And second, I'd like to focus on the agency relationship that I think Gaulden concedes in his brief is really his only path to victory at this point and why that agency relationship can't support Fourth Amendment standing under this court's precedence. To begin with, what I think Gaulden would have needed to show to demonstrate a reasonable expectation of privacy. Given that this was video that was possessed by someone else, that was filmed in public for promotional purposes, I think Gaulden would have needed to show a rather extraordinary contractual relationship between him and Ramsey. Far more than merely the fact of an informal employment relationship as the district court found. Didn't the district court make a comparison to rights that are available to persons under copyright? In which case I'm not sure that you need a contractual relationship. Is that incorrect? So I don't think the court's copyright analogy really works for a couple of reasons. I would say first, the doctrine, the copyright doctrine that the court cited, even on its own terms, wouldn't apply here. And that's because Gaulden, and he admits this, didn't produce the sort of evidence that would be necessary to show that this was a work made for hire under copyright law. He would have needed to show that this was in employment rather than an independent contractor relationship. And he would have needed to show a written agreement to that effect. I think it also doesn't work because it's not clear that a copyright interest is the sort of possessory property interest this court has talked about that gives someone an interest, a Fourth Amendment interest, in a particular work. So you could imagine there might be a work that someone has copyright in, but that doesn't mean that if someone peruses a book on a bookshelf in the library that someone owns copyright in, that there's any Fourth Amendment interest associated with that. It simply doesn't have anything to do with privacy. But that doesn't stand on all fours because the book does—well, in this case, it's his own image that's on the video feed. Is that correct? That is correct, but of course there are other people who are featured on that video as well. And I don't think Gaulden argued, and I don't think the district court held, that simply appearing on a video gives someone a reasonable expectation of privacy in it. Instead, what the district court said was that simply because Gaulden had commissioned the video, that he had a reasonable expectation of privacy in it, that that basically meant that there was a societal expectation that he would get to control it and that he would have a privacy interest in it. And I don't think that can be squared with this court's precedence. So I point to a few places. I point first to the Hunt decision, and this was a slightly older case, but it involved someone—and two brothers, actually—who hired private investigators to tape record people they suspected of mishandling company funds. And they asserted an interest in those tapes that these private investigators, in the course of their principal agency relationship, recorded. And the court rejected that as a basis for Fourth Amendment standing. It said just because there was this principal agency relationship, just because those tapes were made at the instance of these two brothers, that didn't give them a Fourth Amendment interest. And I think that also lines up with the Supreme Court's third-party cases. Both Miller and Smith—yes, Your Honor? I'm listening. Both Miller and Smith involved records that were created in the course of a business relationship. Those records involved material that was fairly personal, and you could potentially glean a lot about an individual's life from. So Miller involved bank records, and from those you could piece together what someone spent money on. Smith involved phone records that you could potentially piece together someone's network of friends and family. And so those cases also involved documents that were created in the course of this sort of business relationship. And the Supreme Court held that that generally doesn't support Fourth Amendment standing. Quick question. Excuse me. You argue that Mr. Galden lacks Fourth Amendment standing to seek suppression at all. And for that, you rely on this three-factor test in this political framework for standing. And you draw this new three-factor test from a couple of cases. But again, the government used kind of a different theory of standing in the district court, which just leads me to ask if you have in any way forfeited reliance on the three-factor test by not asserting it below. So I don't think so. And first, just to clarify, we don't assert that this is a three-pronged test that you have to check X, Y, Z boxes. These are the factors that this court has said are important and are particularly important in cases involving personal privacy. And I will certainly give you that the way we couched this argument below was more in terms of the commercial character of this footage. But I don't think that—I think that's just a And we did argue below that Galden had failed to meet his burden of proof to prove Fourth Amendment standing, including because he had voluntarily opened his life up to filming for these promotional purposes. And that—we first raised that argument on the first page of our opposition to the motion to suppress, which is at page 575 of the Record on Appeal. And that's developed later, I believe, at pages 588 to 889. So I do think that issue was properly presented, even in our opposition. I think it's really the same issue, just kind of a different way of talking about it. What are you saying? You waive your privacy in one photo? You waive it in all? Well, I think this is— What an extraordinary proposition, frankly. So I wouldn't say that necessarily, but this is a motion to—we're here on an appeal from a decision on a motion to suppress. And so that concerns particular evidence that the government— You're darn right. Sorry, Your Honor? You're darn right. It concerns particular— I was wondering why someone from the SG's office would be down here arguing because that implies there are ramifications to this ruling that are fairly broad. So I would say the fact that I'm down here arguing is solely a matter of division of labor in the Department, and I don't think this Court should read anything into that. I think that this case is actually fairly unique in that our argument is that on these particular, I think fairly unusual, constellation of facts called and lacked an expectation of privacy, and that's because you have the public filming, you have the possession by a third party, you have this promotional purpose. What's your best Fifth Circuit case for finding, you know, for reversing the district court? So I would say that our best case, just to give a relatively recent one, would be this court's decision in Bodian. And so that case involved privacy interests asserted in a cell phone. Granted, the particular information there was location information. But the defendant in that case argued that he had a privacy interest in the phone because, among other things, he paid for it, and he had used it to—for a number of purposes, including, he argued, to film videos, including intimate videos. And this court held that that's generally not enough. The general rule is a defendant lacks an expectation of privacy in property possessed by someone else. And so I think to show a reasonable expectation of privacy here, Gauldin would have really had to show a kind of unique employment relationship between himself and Ramsey with particular terms. At the very least, he would have needed to show that the terms of that relationship required Ramsey to keep this video footage under guard, to not let other people view it. And I don't think either the district court's findings or the evidence here supports that. In terms of the district court's findings, the district court really focused on the business relationship between Gauldin and his record label. But he did retain control over what video footage would be used for a commercial purpose, right? Not all of the video footage was used for a commercial purpose. He had the authority to determine what was going to be uploaded and what was not. Is that disputed? That is not disputed. The district court found, and we don't dispute, that he did have the authority to decide what to post on social media. Further to Judge Jones' question, just because he gave permission to upload picture number one does not mean that every picture on the SD card was used for a commercial purpose or that there was the same expectation of privacy in what was uploaded as opposed to what was not. Well, I certainly think that the privacy interests would be different there. I think if this were video that he actually had uploaded to social media, there wouldn't even be a question. But I think the fact that he could have edited some of the video out doesn't change that there was no subjective expectation of privacy in this video and that it really wasn't intended to be private in the first instance. So even before it was uploaded on social media, this is video that was shot in public with a bunch of other people. It was video that a third party, Ramsey, who he engaged through this business relationship, saw as he was filming it. And I don't think either the district court's findings or the records suggest that Ramsey kept this video very closely. And I point to two things for that. I point to one, Ramsey's other SD cards were found unattended in a nearby vehicle. And the second thing I'd point to is that Lily Thrall, one of the record label witnesses, testified that when she would receive video from Gauldin's Orbit, I guess, for use in music videos, she received it not from Gauldin personally, but from others on his behalf. And this was at— That is the video that was used for a commercial purpose or promotional purpose. That's what you're referring to. That's what she received from a third person. It's correct that that video was certainly intended to be used in promotional materials. But I think what it shows is that other people had access to this. At the very least, other people were involved in handling it before it got to the record label. Other people may have been involved in editing it. And Gauldin bore the proof in this case to show a reasonable expectation of privacy. And he didn't introduce any evidence, and the district court made no findings in terms of specific terms of the agreement between him and Ramsey that would guarantee this video was closely held, that wasn't shared with others, either in the handling of it or how Ramsey may have otherwise used it. So when looking at—circling back to Judge Douglas' question earlier—when looking at Mr. Gauldin's sort of standing to seek suppression, do we analyze the lifestyle footage in the aggregate, or do we focus only on those images that appear in the record before us? So I think the right focus of the inquiry should be the footage that the government seeks to use. So not just the two photos that were put in at the district court hearing, but the footage the government seeks to use, but not, you know, footage that may have been recorded on other days that might implicate other interests. And I will point out on this, Gauldin argues that some of this was rather personal footage. I don't think that necessarily matters. In our brief, we give the example of, you know, someone who appears on a reality TV show. There may be some of that footage that is personal. It might be embarrassing. It might, you know, not be footage that after the fact they like being out there, but they understand that it would be used—that it would be seen by others in the production process, and that ultimately it may or may not, if it gets edited out, be presented to the public. I was just wondering if one of these videos showed him and his cohort sitting around in a, you know, living room smoking dope of some sort. Would he have been charged with drug crimes? And I don't mean mere possession. I mean suppose they were with their dealer or something, or they were dealing. So I would say not to comment on the charging decision, but in terms of whether that evidence could have been used, I think that would certainly be a harder case. I think nonetheless, it would be very significant that the video was filmed for the purpose of promoting Gauldin's lifestyle and connection with his music brand on the Internet, and if part of that involved those sorts of activities, I think that would be a factor. And I think it would be a very significant factor, again, that this was filmed by a third party who was brought in to this otherwise private setting. There are loads of cases that involve searches of personal cell phones where the police, for whatever, they think they're picking up a fellow who's dealing drugs. They look at it. They get an authorization to search the cell phone, and it's his because they say, well, he's dealing drugs, and normally there's evidence of sources and methods on that. So then they get into the cell phone records, and then they find child porn, and he gets charged with child porn instead. So is this case analogous to that? I think there are two key distinctions. Again, one, this is not his phone. This is someone else's camera, and that carries with it, if I may briefly finish, that carries with it ramifications for privacy under both Supreme Court and this Court's precedent. And then two, this wasn't video that the person just happened to have on their phone. This was video that was recorded for the purpose of promoting Galton's public personality on the internet. Okay. Well, you have a chance for rebuttal. Thanks very much. Thank you. Mr. Belanger? Or are you Belanger? Belanger, Your Honor. Belanger. Okay. May it please the Court. The exclusionary rule prohibits police misconduct. And in this particular case, we have at least four examples of police misconduct found by the Court. First, the police in their warrant inserted a false date in order to establish probable cause to get the search warrant for the video media card in question. Second, the police officer intentionally added in the names of and identification of the gangs when he was not given that information by an informant or a 911 caller. Third, the police exceeded the authorized scope of the search authorized by the warrant. The original warrant said that if you seize this evidence, you then have to come back to us to search its contents. And then fourth, the actions of the police officers in detaining everybody on the scene, I'll just say, were unseemly. Now, what the government has done in their brief is they have waived the challenges to the no probable cause finding of the warrant. They've also waived the district court's finding that the officers acted in good faith under Leon because they did not brief it. In listening to my colleague's argument today, one of the things that I would like to turn to is I believe he was relying upon the Bowdoin decision to be the best case in support, and that is not an apples-to-apples comparison in this particular case. As I understand, Bowdoin, someone is challenging the cell phone data off of a passenger in the vehicle that they were with, and that's just really not the case here. And when we look at some of the factors to determine the subjective interest or your privacy rights, not everything that is these factors, or a lot of these factors, I guess, are geared towards real property issues and not necessarily what we have here today when we're dealing with someone's name, image, and likeness. But there's one factor that I do think is pretty interesting, and it's on point, at least with an analogy, is the ability to exclude. Like what steps did you take to exclude people from accessing your property? The testimony from Atlantic is they could not compel Mr. Gauldin to give them any of the footage. So Mr. Gauldin does have the right to exclude what is and what is not released for commercial use. And I don't believe that the government can test that, but that is a very, very important fact. Not everything that he has filmed will go to Atlantic Records. They have no idea what he's filming. That's not the issue here. The issue is any relationship between him and Ramsey, the photographer. Yeah, there is a relationship, and I believe that the district court found a very good factual support to establish that relationship. I'll start with the macro and bring it down to more specific. First, we had testimony from the record label dealing with what is called B-roll footage. This is something that is common in the industry where celebrities like Mr. Gauldin have videographers that follow him around all day filming their interactions in their life that maybe one day the artist may use either in a video itself or for social media productions. Second, with regards to Mr. Ramsey— On that point you just made, I mean, there have been some other pretty high-profile examples of music artists losing pretty high-profile disputes regarding the ownership of sort of behind-the-scenes archival documentary-type footage, right? So Lil Wayne, another Louisiana-based rapper, he lost a pretty high-profile dispute regarding ownership of lifestyle footage, and a lot of that footage ended up in a documentary. And same for Kanye West, same for Drake. They've been unable to prevent the release of these behind-the-scenes archive videos. And given those facts, I wonder how your client had an objectively reasonable expectation that all this footage would remain private. Well, he is using Mr. Ramsey basically as a tool, okay? Mr. Ramsey's purpose is to film him. And we're talking about the context of a criminal case with the Fourth Amendment as opposed to necessarily a purely civil case. The relationship with Mr. Ramsey, there is a bank record for payment from Red River Bank for the videographer, Mr. Ramsey, who uses an alias in his production procedures. And we know that for the day of and the day before, the police were going out to Mr. Gaulden's house looking for him because they knew that he was filming a video. Those all suggest that there is a relationship between Mr. Gaulden and between Mr. Ramsey to do what was done here. How do you respond to your opponent's question or statement about the filming being done in a public place? Some of the film is done in a public place. Some is not necessarily done. What about the photos or the video that is at issue in this? We're still talking about Mr. Gaulden's name, image, and likeness and whether or not that is going to be released. This isn't a case where somebody else... Even if any celebrity or high-profile figure is in a public place and they're taped in a public place, doesn't that change the landscape of how you analyze the argument? It doesn't change my analysis for purposes of the work that we've commissioned to be produced. If there was a third party down the street with their own cell phone and the government wanted to use that, then that's a different issue. But that is not the case. There would be no difference then if Mr. Gaulden was videotaped in the privacy of his own home as opposed to on a public street. There would be no difference according to the argument that you just made. By a third party, maybe, but not by Mr. Ramsey. There's going to be footage film of him outside, him inside, him in vehicles. I'm not good with hypotheticals, but I think this works. It's spring break and you've got a couple of girls out at the beach. One of them asks to take a video of her. She asks her friend to video her. Then she does something really stupid, but it's on her friend's phone. Did she have a reasonable expectation of privacy in what she asked her friend to video on the friend's phone? That is a very interesting question because I think in some cases the answer is yes. There are some revenge porn type of statutes that a lot of states have enacted. I believe federally just recently in March of 2022 there was a national violence against women's act of 2022 that deals with establishing a civil cause of action for certain images that someone else then goes and presents. I understand what you're saying and that's pertinent, but sometimes these things get out by accident, too. Some may get out by accident, but the clear distinguishing factor here is that we're friends at spring break filming ourselves. This is Mr. Gaulden having his personal videographer who follows him filming him for the possibility that there will be something on there that will later be submitted for production. You could say he's on permanent spring break, sorry. Even when he's on something like a permanent spring break, he is being followed by a videographer. That's the purpose of the B-roll footage. It's not just unique to him. Atlantic said that other rappers and entertainers do this. He is commissioning the work for his use at a later moment in time if he alone exclusively decides. Let me ask you this. In a few weeks I'm going to go officiate a wedding. Let me ask you a question about wedding photographers and videographers. The couple hires the photographer or videographer. They come and document the wedding, take pictures, take videos. The couple decides which photos or videos they want to share with the world, which ones they post or share. But the photographer, the videographer usually retains ownership over those photos and videos. How is this case any different? There's no indication that Marvin Ramsey possessed or had ownership. This isn't his content to own. With wedding photographers, there may be a special relationship where it's understood that the wedding photographer is still going to own the photographs. But that's not the expectation with your videographer doing your B-roll film. So, I understand that your client had—he decided which video snippets were going to be uploaded, that were going to appear on social media or in music videos. Does that mean that the leftover footage, the unused footage, was private for Fourth Amendment purposes? Could Ramsey have chosen to use any of this leftover footage in a documentary? I think Mr. Gauldin could have a cause of action against him. And depending on what private information was released, possibly Atlantic. For example, if Mr. Gauldin was singing his childhood lullaby based on one of the songs that Atlantic had already produced, and Mr. Ramsey wanted to go and put that out there, not only is that Mr. Gauldin's name, image, and likeness, but now you're making a commercial venture off of something that Atlantic would have a contractual right to. So, I think Mr. Ramsey would be putting himself in some civil hot water. What about the Supreme Court case—and I'm sorry, I forget the style of it— where the defendant had put illegal drugs in some lady's purse and then claimed he had a privacy interest? I don't think that that would be reasonable, because it's not his purse. So, I don't think that that would— Well, this isn't Ramsey's photography equipment, Ramsey's work product? Well, it's his property, but it's not his work product, and he is a tool for Mr. Gauldin's use. And so, that's where I think the distinction with the purse analogy breaks down. Maybe if there's a hypothetical situation where— I mean, you're creating—but it was the LLC that paid Ramsey. There's no written contract, and I'm not quite sure what the parameters of a— what would the parameters of this legal relationship be that would allow him to— other than that Ramsey wants to get paid more, but what are the legal parameters that mean that he is in total control of this? He being Mr. Gauldin? Yes, sir. Because the whole purpose of having Mr. Ramsey was for the purpose of filming Mr. Gauldin for Mr. Gauldin's artistic use down the road if he wanted to do it. Well, I know that's what he wanted, but he didn't have anything in writing to declare this is— in other words, I think, Chuck, and maybe I was just not focusing, but in Judge Willett's deal, doesn't the wedding photographer normally say, I have copyright protection on this, and you've got to pay me again in order to get copies of the photos? Yeah, I understand that point, but I don't believe that's the situation that we have here, and we're not required to necessarily have a written contract with Mr. Ramsey. I think that is one of the— Again, what's your best case for that proposition? Well, the written requirement is dealing with the nuances of a pure Copyright Act charge or suit, but as the district court put in its ruling that the common law rights on property preceded the Copyright Act, my best case to argue to this court is really dealing with how the court should look at the district court's findings, and that's the Massey decision. While this court is looking at standing de novo, it is the factual determinations of the district court that is going to be by clear error, and the court found that there was a relationship between Cantrell Gauldin and Marvin Ramsey that existed in the past. The court found that B-roll footage is something that Mr. Gauldin used for his videos and that he had the ability to choose when it was released and when it was not released. Well, isn't this arguably a question of law rather than fact? Because even if we assume that he had a subjective expectation of privacy, the next part of that standard from the Supreme Court's perspective is whether society would regard this as reasonable, and we determine that. We don't take a poll of society.  I think there's a couple of cases that we can show that would demonstrate that our subjective belief is objectively reasonable. When we look at the Riley decision dealing with cell phones, one of the things that the court said that made cell phones different than other objects and property was that there's going to be a lot of video on here and it could go back for a long period of time. In that situation, someone's protected interest in their videos is certainly recognized, and also the Byrd decision where, in my opinion in reading Byrd, we're now saying you don't have to be the owner of the car, you don't have to be the authorized person by Hertz or whatever to drive the car or to have standing to challenge a search of the car. If you're driving it, it's objectively reasonable that you do have standing in this case. I think that there is a little bit of a broader interpretation of standing than what the government is proposing here based on those two decisions. Then even Carpenter decision where even your movements in the public, the fact that it's being tracked by the different phone towers, you would still need a warrant for that. I mean, where this case will go, I'm not certain, but in Riling and Carpenter, the defendant owned the cell phone. And it's our position that Mr. Galden owns his name, image, and likeness. That's almost as broad a holding as the one that I mentioned to the government, that if you forfeit privacy in one photo, you forfeit them in all. To say it's your name and therefore you're protected in all is a very broad… It's within the context, Your Honor, of him having the videographer here for him to document his name, image, and likeness for when we decide that we want to release it for commercial use. It's not quite as broad as I guess I maybe made it sound out to be, Your Honor. With the few minutes that I have left, I would like to just state that while the court is allowed to look at the standing issue, as I said a moment ago, de novo, I believe that there are sufficient findings in the record to show that Mr. Galden proved by a preponderance of the evidence that Marvin Ramsey was commissioned to get B-roll footage for him and that it is up to Control Galden as to when that is to be released. And that should be sufficient to establish a privacy interest in the footage that is both subjective to Mr. Galden, objective in terms of societal expectations, and that the district court's ruling should be affirmed. I don't like to speak just for the sake of speaking. I know I have two minutes left on my time. If there's any other questions, I would be glad to entertain them. Nope. Very interesting issue, but I think we've plumbed it. Thank you very much. I appreciate it. Congratulations to each other. All right. Mr. Yablon. Thank you, Your Honor. I'd like to focus on one particular point that my friend kept coming back to, and that was that the district court found that there was a relationship between Galden and Ramsey. And I think that's right, but that's not enough. The mere fact of that employment relationship doesn't speak to whether Galden reasonably expected the information to remain private or took precautions to keep it private. I think this case is very similar to the case Judge Jones referenced, Rawlings, that involved a defendant who stashed drugs in a friend's purse, even though he claimed a property interest in the drugs. There was no reasonable expectation of privacy there. I think another case along those lines is Frick, which involved documents related to a joint business venture that were kept in the business partner's briefcase. And again, despite this agency relationship, despite the fact that the documents, you know, had some bearing on the defendant, the court held that there was no reasonable expectation of privacy. So, Judge Willett, I think your intuition about behind-the-scenes footage, ending up in documentaries, is the right one here. I think generally an actor lacks a reasonable expectation of privacy in video footage that's filmed, whether that is behind-the-scenes footage or not. But the point I would emphasize here is that even if that intuition doesn't seem ironclad, Galden bore the burden to establish a reasonable expectation of privacy in this case. And the district court made no findings about the terms, the specific terms of Galden's relationship with Ramsey, and there wasn't evidence about that either. The evidence that was presented related solely to Atlantic Records' relationship with Ramsey, whether Atlantic Records could insist, or sorry, with Galden, whether Atlantic Records could insist that he turn over particular footage, and there were no findings and no evidence presented about whether Ramsey was obligated to keep this footage closely held or could use it for other purposes or had to take certain precautions when maintaining it. Finally, I would just like to allay concerns about harder examples. I think the wedding photographer example is a little bit harder because people have different intuitions, despite the fact that the wedding photographer typically retains the property interest in the footage, about whether nonetheless that, because it is very personal footage, someone should have a reasonable expectation of privacy in. And I don't think that's the sort of argument that Galden is making here, and specifically I point to page 19 of his brief, where he says that this footage, he would lack a reasonable expectation of privacy in if it were filmed by anyone other than his agent or contract employee is the term that he uses. And so I think his argument really does hinge on this agency relationship. I think the district court looked at this pretty much the same way. Saying that the question it was setting out to answer was the abstract question of whether someone had a reasonable expectation of privacy in video recorded by their cameraman, and then the answer that it gave for that question was a very legally reasoned answer focusing on copyright principles to basically say that that agency relationship by its own creates a reasonable expectation of privacy. And I don't think that can be squared with this court's precedent and with the Supreme Court's precedent. We go through these cases in our brief on page 19 and then in the reply on page 2. In case after case, this court has held that this sort of a principal agency relationship, even if some sort of document or work is produced in the course of that relationship, is not enough to support a reasonable expectation of privacy. So given the public nature of this footage, the fact that it was possessed by a third party, that it was filmed for promotional purposes, and the lack of any evidentiary showing as to terms that would require it to be kept private, the district court suppression order should be reversed. All right. Thank you. We have your argument. And as I said, we only have one case today, so we stand in recess.